IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BEVERLY WALKER          :
                        :
                        :
     v.                 :     Civil No. CCB-12-3151
                        :
                        :
UNIVERSITY OF MARYLAND  :
MEDICAL SYSTEM          :
CORPORATION, et al.     :

## MEMORANDUM

Now pending before the court is a motion to dismiss or, in the alternative, for summary judgment, filed by the University of Maryland Medical System Corporation ("UMMS"), the University of Maryland Medical Center ("UMMC"), Dr. Renee Fox, and Jennifer Fitzgerald, (collectively, the "defendants") against plaintiff Beverly Walker ("Ms. Walker"). Ms. Walker alleges that she was terminated from her position at UMMC based on her race and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). She also brings a claim of defamation under Maryland common law. The issues in this case have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons stated below, the defendants' motion to dismiss, construed as a motion for summary judgment, will be granted.

## BACKGROUND

Beverly Walker began working for UMMC as a full-time staff nurse in 1985.[1] After obtaining her nurse practitioner certificate in 1992, she worked both full-time and half-time at UMMC until she accepted a full-time nurse practitioner position at UMMC in 1998. Ms. Walker

---

[1] UMMC is a member hospital of UMMS, a private, not-for-profit network of academic, community, and specialty hospitals located across Maryland.

worked as a Neonatal Nurse Practitioner at UMMC for fourteen years, regularly scheduled on the night shift, until her termination in October 2011. In addition to working at UMMC, Ms. Walker worked part-time at Johns Hopkins Bayview Medical Center as a Neonatal Nurse Practitioner.

On October 14, 2011, Ms. Walker performed a physical examination on an infant ("Baby Doe") who had been admitted two days earlier. Baby Doe had pulmonary hypoplasia, a fatal condition marked by severe respiratory and kidney distress. Baby Doe, with two umbilical tubes and three chest tubes, was attached to a cardiorespiratory monitor, a pulse oximeter, and a neonatal high frequency oscillator. Baby Doe's mother, who was present in the examination room along with the infant's father, two family friends, and the family's priest, asked Ms. Walker if she could hold Baby Doe. Ms. Walker consulted by telephone with the attending neonatologist, Dr. Jocelyn Leung, concerning the plan of care for the infant.

According to Ms. Walker, Dr. Leung agreed to allow the family to hold Baby Doe but specifically instructed Ms. Walker to change the infant from the high frequency oscillator to a conventional ventilator. (Compl., ECF No. 1, ¶ 20.) Ms. Walker also claims that she questioned changing the ventilator, noting that a slower ventilator could cause a more rapid deterioration of the infant's condition and even hasten his death. (*Id.* at ¶ 21.) Dr. Leung insisted on the change. (*Id.*)

As the nurse practitioner assigned to the NICU that evening, Ms. Walker supervised two nurses, Sondra Hayudeni and Sarah Schlotterbeck. At midnight, Ms. Walker attended a meeting with Fellow Sheela Morthy, the two nurses, Baby Doe's parents, and the family priest. Baby Doe's condition and prognosis, including the changing of the ventilator and the possibility he could arrest, was explained to the parents. Baby Doe's parents insisted on being able to hold him,

2

so Baby Doe was moved to a small, isolated room, where, in the presence of the two nurses, the infant's parents, and the priest, Ms. Walker changed the ventilator and wrapped the infant to transfer him to his mother. Because of the length of the IV tubing, Baby Doe could not reach his mother. Ms. Walker instructed Nurse Hayudeni to flush and heparin lock the IV fluids to keep the sites viable for re-attachment, and to transfer the infant to his mother for a few minutes. Baby Doe remained incubated and continued to be ventilated by the conventional ventilator.

Soon afterward, Ms. Walker was paged for her immediate assistance elsewhere in the NICU. The two nurses remained in the room attending to Baby Doe. Approximately twenty minutes later, Ms. Walker was walking past the doorway to Baby Doe's room when the family priest beckoned her. Ms. Walker reentered the room to find Baby Doe's mother still holding him. Baby Doe had turned blue. The respirator mask was still on his face and he remained incubated. Baby Doe's father, the priest, and the two nurses were also in the room.

Ms. Walker immediately auscultated for a heartbeat three separate times, but she could not find one. Ms. Walker contacted Fellow Moorthy to inform her that Baby Doe had died. She then returned to Baby Doe's room, and, at the parents' request, removed the endotracheal tube so they could clearly see his face. The parents and the priest left the floor shortly afterward and the two nurses took a break. Ms. Walker completed the administrative notations required in the event of the death of a patient. She finished her shift on the morning of October 15th, and worked two more shifts the next two evenings.

On or about October 21, 2011, Ms. Walker received a call from Jennifer Fitzgerald, the lead nurse practitioner at the NICU. Ms. Fitzgerald informed Ms. Walker that she was suspended and on administrative leave pending the outcome of an investigation into Baby Doe's death. At some point during or after the investigation, Ms. Walker provided a signed, handwritten

3

statement in which she acknowledged discontinuing IV medications prior to leaving Baby Doe's room. (ECF No. 6, Ex. A, 3.) Ms. Walker also admitted that "the fact that the IV fluids [were] on hold completely [slipped her] mind." (*Id.*) Finally, Ms. Walker stated that she "should have given the nurses parameters of when to call [her]" and "should have had better focus on [her] sickest patient." (*Id.* at 4.) On October 26, 2011, Ms. Walker attended a meeting with Ms. Fitzgerald and Carmel McComiskey, where she was terminated. Ms. Walker claims that Ms. Fitzgerald and Ms. McComiskey accused her of negligence that caused Baby Doe's death, as well as of issuing an unauthorized Do Not Resuscitate (DNR) order on the infant. (ECF No. 1, ¶ 60.) She also claims the two women threatened her with filing criminal charges if she protested her termination. (*Id.* at ¶ 61.) Following Ms. Walker's termination, UMMS and UMMC hired Jenny Dukes, a white female under age 40, to replace her.

In February 2012, Dr. Renee Fox, an Associate Professor at the University of Maryland School of Medicine, contacted the Maryland Board of Nursing ("BON") regarding Ms. Walker's conduct the evening of Baby Doe's death. Ms. Walker claims that Dr. Fox accused Ms. Walker of the same conduct alleged by Ms. Fitzgerald and Ms. McComiskey. (*Id.* at ¶ 64.) Dr. Fox was not present in the hospital when Baby Doe died and was not in Ms. Walker's chain of command. After Dr. Fox's call, BON launched an investigation, which included a personal interview with Ms. Walker in late June 2012. The defendants all participated in the BON investigation.

On April 13, 2012, Ms. Walker filed an EEOC claim against UMMC, alleging race and age discrimination stemming from her termination. She filed suit in this court on October 25, 2012, bringing claims of race and age discrimination under Title VII and the ADEA, as well as common law defamation.

## ANALYSIS

**Standard of Review**

The defendants have moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(b); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551, 556 (D. Md. 2003). The parties, however, "shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). The requirement of "reasonable opportunity" means that all parties must be provided with notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment, which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious").

Ms. Walker had adequate notice that the defendants' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are in themselves sufficient indicia. *See Laughlin*, 149 F.3d at 260-61. Moreover, Ms. Walker referred to the motion in her opposition brief as one, alternatively, for summary judgment. If Ms. Walker thought further discovery was necessary to oppose summary judgment adequately, Rule 56(d) obligated her not only to indicate her need for discovery but to set out reasons for her need in an affidavit, which she has not done. *See* Fed. R. Civ. P. 56(d); *see also Laughlin*, 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate

5

discovery when the nonmoving party failed to make an appropriate motion under Rule 56). Therefore, the court will consider the additional materials submitted by the defendants and will treat their motion as one for summary judgment.

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

**Discussion**

*Defamation*

Ms. Walker alleges that Ms. Fitzgerald, Dr. Fox, and other UMMS and UMMC employees published false information about Ms. Walker's actions the evening Baby Doe died, including that Ms. Walker's negligence and/or premeditated intent caused Baby Doe's death, and that Ms. Walker executed an unauthorized DNR order on the infant, thereby causing his death. (ECF No. 1, ¶ 63.) To recover for defamation under Maryland law, a plaintiff must establish: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van Smith*, 424 Md. 294, 35 A.3d 1140, 1147 (2012) (citations and quotations omitted). Where a defendant asserts a privilege, the court first considers whether the asserted privilege applies. *Id.* A qualified privilege defeats a claim of defamation as long as the defendant did not abuse that privilege. *Id.*

Here, the defendants claim they are immune from liability for any allegedly defamatory remarks they made to the State Board of Nursing ("BON") concerning Ms. Walker's conduct the evening of Baby Doe's death. Under Maryland law, "[a] person who acts in good faith and within the scope of the jurisdiction of the [State] Board [of Nursing] is not civilly liable for giving information to the Board or otherwise participating in its activities." Md. Code Ann., Cts. & Jud. Proc. § 5-708(b). The Maryland Code also requires nursing professionals who "know[] of an action or condition that might be grounds for [disciplinary] action" by the Board of Nursing to report it to the Board. Md. Code Ann., Health Occ. § 8-505(a)(1). Individuals who report such incidents are guaranteed immunity from civil liability, provided they act without malice. *Id.* at § 8-505(a)(2); Md. Code Ann., Cts. & Jud. Proc. § 5-709.

In Maryland, a defendant is entitled to a common law qualified privilege and "will not be held liable for a defamatory statement if the person is acting in furtherance of some interest of

7

social importance, which is entitled protection." *Gohari v. Darvish*, 363 Md. 42, 55, 767 A.2d 321, 328 (2001); *see also Blankson-Arkoful v. Sunrise Senior Living Servs., Inc.*, 449 F. App'x 263, 266 (4th Cir. 2011).[2] As another judge of this court has noted, the reporting of possible misconduct on the part of nursing professionals is certainly a matter of social importance. *See Alford v. Genesis Healthcare*, 2007 U.S. Dist. LEXIS 26196, *15 (D. Md. Apr. 9, 2007) ("The strong public interest in favor of regulating the conduct of health care professionals is codified in the Maryland Code."). Thus, the defendants appear entitled to a qualified privilege with regard to any statements they made to the BON.

A plaintiff may overcome a qualified privilege by showing that the defendant abused the privilege. *Piscatelli*, 35 A.3d at 1148. "To demonstrate abuse of the privilege, the plaintiff must demonstrate that the defendant made his or her statements with malice, defined as 'a person's actual knowledge that his [or her] statement is false, coupled with his [or her] intent to deceive another by means of that statement.'" *Id.* (quoting *Ellerin v. Fairfax Sav. F.S.B.*, 337 Md. 216, 652 A.2d 1117, 1129 (1995)). Malice is usually a question for the fact-finder, unless the plaintiff fails to allege or prove facts that would support a finding of malice. *Id.*

Here, Ms. Walker has failed to produce evidence by which a jury could reasonably infer that the defendants acted with malice when they made statements to the BON regarding Ms. Walker's conduct on the evening of Baby Doe's death. Moroever, with the exception of Dr. Fox, the defendants' statements to the BON were made in response to an investigation, entitling the defendants to even greater latitude in what they may say without incurring liability. *See Happy 40, Inc. v. Miller*, 63 Md. App. 24, 35, 491 A.2d 1210, 1216 (1985). Because Ms. Walker has not

---

[2] Unpublished opinions are cited not for their precedential value but for the persuasiveness of their reasoning.

alleged facts that would support a finding of malice, her claim of defamation cannot overcome the defendants' qualified privilege.[3]

*Discrimination*

Ms. Walker also claims that she was discharged from her position because of her race and age. Because no direct evidence of race or age discrimination has been presented, these claims are analyzed under the three-pronged burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006). Under this framework, a plaintiff alleging discrimination under Title VII or the ADEA must first make out a *prima facie* case of that discrimination. If she succeeds in carrying this initial burden, then "the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lettieri*, 478 F.3d at 646 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)); *Laber*, 438 F.3d at 430. Once such a reason is provided, the burden shifts back to the plaintiff to demonstrate that the given reason was a pretext for unlawful discrimination. *Id.*

To establish a *prima facie* case of race or age discrimination, a plaintiff ordinarily must show that: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at

---

[3] It is unclear from the complaint whether Ms. Walker is also claiming that the defendants made defamatory statements to individuals or entities other than the BON. For example, in addition to claiming that the defendants made false statements to the BON, Ms. Walker refers to defamatory statements made to "third parties" and "disinterested third parties." (ECF No. 1, ¶¶ 63, 68-71.) She also alleges that Dr. Fox shared false information with "person[s] otherwise protected by qualified privilege, including but not limited to the Maryland Board of Nursing." (*Id.* at ¶ 69.) At no time does Ms. Walker specify the identity of the other parties, nor does she provide a specific description of when and how the alleged statements were communicated. To the extent that Ms. Walker alleges defamation for statements not made to the BON, then, her allegations fail for lack of specificity. *See Skillstorm, Inc. v. Electronic Data Systems, LLC,* 666 F. Supp. 2d 610, 619-20 (E.D. Va. 2009).

9

the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Lettieri*, 478 F.3d at 646 (quoting *Hill*, 354 F.3d at 285). It is undisputed that Ms. Walker has met the first, second, and fourth elements of a discrimination claim. She is an African American over the age of 40, she was terminated from her position, and she was replaced by a Caucasian under age 40. The defendants argue, however, that Ms. Walker cannot make out a prima facie case because she has not alleged sufficient facts to support the third element – that she was performing her duties at a level that met her employer's legitimate expectations.

In determining whether an employee was performing at a level that met the employer's legitimate expectations, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citing *Evans*, 80 F.3d at 960-61). Although a satisfactory performance review may be used to show that an employee was meeting expectations, a plaintiff must also show that she was meeting expectations "at the time of the adverse employment action." *Pilger v. D.M. Bowman, Inc.*, 833 F. Supp. 2d 489, 495 (D. Md. 2011) (internal citations omitted) (holding that a satisfactory performance review given eight months before an employee was fired was insufficient to establish a prima facie case). Here, Ms. Walker alleges merely that during her tenure with UMMC, her annual performance evaluations were "consistently satisfactory." (ECF No. 1, ¶ 13.) In addition, she notes that she was permitted to work two additional shifts at the NICU after the incident involving Baby Doe. (ECF No. 1, ¶ 48.)

Even assuming that Ms. Walker has made out a prima facie case of discrimination, the defendants have articulated legitimate, nondiscriminatory reasons for Ms. Walker's termination that she cannot show to be pretextual. Ms. Walker discontinued life-sustaining IV medications

prior to leaving Baby Doe's room and forgot that the medications were on hold. She also failed to provide appropriate communication parameters to nurses under her direction and to focus on her sickest patient. Ms. Walker herself acknowledged that her conduct "may have contributed [to] or caused [Baby Doe's] demise." (ECF No. 6, Ex. A, at 3.)

Furthermore, Ms. Walker has failed to meet her burden of showing that the defendants' reasons for terminating her employment were false or pretextual. The possibility that other employees' conduct may have also contributed to Baby Doe's death does not undermine the validity of defendants' reasons for terminating Ms. Walker. This is particularly true in light of the fact that it was Ms. Walker's responsibility to supervise those employees. Accordingly, Ms. Walker has not rebutted the defendants' legitimate nondiscriminatory explanation for her discharge, and the court will grant the defendants' motion for summary judgment as to Ms. Walker's race and age discrimination claims.

A separate Order follows.

May 30, 2013                                                   /s/
Date                                                                Catherine C. Blake
                                                                 United States District Judge